The Honorable Judges of the United States Court of Appeals in and for the Second Judicial Circuit, herein, herein, herein. All persons having business before this honorable court are admonished to draw near and give their attention as the court is now heading. God save the United States and this honorable court. Good morning, ladies and gentlemen. We are here today, and we also have Judge Mannion on the remote appearance. Our first case for today is Pavlock v. Holcomb, No. 21-1599. And we're glad to hear from you, Mr. Kaiser. Good morning, and may it please the court. I'm Chris Kieser, and I represent the appellants. Randy and Kim Pavlock have owned their beachfront property in Porter Beach, Indiana, for decades. They've used the private beach next to their home along Lake Michigan for recreation with family, friends, and neighbors. Their deeds reflect their ownership of the shoreline. They pay property taxes on this land. Like most property owners, the Pavlocks and the other inholders— What exactly does the deed say about the lakeward extent of their property? The deeds in the Porter Beach area where the inholders, like the Pavlocks and Ray Kahneman, are, they're actually platted with, I think it's 100 by 25 lots. And so they extend out. The deeds, the platted deeds extend out below, as we allege in the complaint, below any— Well, right, as you allege. I'm looking at the way the Indiana Supreme Court in the Gunderson case described the plats, and there's not a level of precision in this description that would allow you to distinguish between the ordinary high watermark and the low watermark. Well, Your Honor, in Gunderson, the plats were not—the deeds were not platted as they are here. They're actually—I believe that they simply referenced Lake Michigan as the boundary. Well, it says the Gunderson's deed, the 1914 plat to which the deed refers in the plat survey. So there's a plat in there. Whether it's a new one is a different question. Yes, Your Honor. I think the question there was that there was—essentially the dispute was over the interpretation of whether the deed there referred to the low watermark or the water's edge or the ordinary high watermark. But there was no—as far as I remember, the deeds in that case were not, as they are here, platted and actually drawn on a survey, as we've attached to the complaint here, which show the properties, the platted lots along Lake Michigan and Porter Beach, and that some of them—actually, some of them extend even into where the lake is currently. Right. You know, let me just cut right to the chase. One thing that really worries me about your case is I'm having trouble conceptualizing it as anything but an effort to have a lower federal court, not the Supreme Court, override an authoritative decision of the Supreme Court of Indiana. And this is obviously not a Rooker-Feldman scenario. I get that. It's not that. But the state courts have addressed precisely the issue that you're talking about, and you just don't like the answer they gave, as far as I can tell. Well, Your Honor, we're not arguing that—actually, that Gunderson is an incorrect statement of Indiana law. What we're actually arguing is that by changing the law— But did they change the law? This is a really important move in your argument. Did they change it, or did they simply settle it for the first time? Well, Your Honor, that's—of course, the Gunderson court said that it was simply clarifying unsettled property rights. However, as we've alleged, there's 180 years of both Indiana precedent, which applies to equal-footing land along the Ohio River, and then there's, as we've alleged, the history of development in the 20th century with acknowledgments by the federal government that landowners own below the ordinary high water mark. And there's also record evidence of—well, that we've alleged in the complaint of municipalities owning beach property and excluding members of the public who are not residents of their municipality. So, in a sense, you're making an adverse possession argument, it seems to me, because as of 1816, when Indiana becomes a state under the equal-footing doctrine, it has the land up to the ordinary high water mark, which, of course, for something like the Great Lakes, non-tidal bodies, is a somewhat different thought than, say, in England, where it might have been the high tide mark. But we've crossed that bridge long since under federal law. And so you're saying that even though the Gunderson case is the first time the Indiana Supreme Court ever had occasion to write about this, to opine, that somehow adverse possession gives your clients these rights? No, Your Honor. Our argument is essentially that in 1837, in the Stinson v. Butler case, the court held that property owners owned to the low water mark along the Ohio River. That's the Ohio River, which the Indiana Supreme Court distinguishes. That's true, Your Honor. The Ohio River is also an equal-footing navigable water, and the Supreme Court has said many times that states have the right to dispose of their equal-footing land after statehood, however they wish. But by what act did Indiana dispose of this band of land between the ordinary high water mark and the low water mark? Well, generally this happens through the common law, as in the rest of the Great Lakes states. So can you point to an act of abandonment or of sale or of something? Well, no, Your Honor, because ever since 1837, it's been understood that property owners could own to the low water mark. And that, I think, we've at least plausibly alleged that the history of the 20th century supports the claim that Stinson and its progeny should apply to Lake Michigan, and that Apelli's argument that Gunderson simply clarified the law is really less plausible than our allegation that Weaver was owned by Stinson. So your argument really is just that in this section of the Gunderson opinion, the Indiana Supreme Court just got it wrong, because they certainly talk about the Martin case. Your Honor, I think what the Indiana Supreme Court did was change the law that had applied to Indiana since 1837. Even though they say they didn't. That's true, Your Honor. I mean, it doesn't necessarily – courts can change law without – I mean, sometimes without saying that they're doing it up front. Mr. Kuser, can I ask you a question? Sure. It's a little bit of a threshold question akin to where Judge Wood started. As I sit here, I think we have to take Gunderson as is, good, bad, or indifferent, right, under – go back as far as U.S. Supreme Court's decision in Murdoch. I mean, Indiana's state Supreme Court's the highest court. It's a pronouncement of Indiana law that way. So we take that. The difficulty that I have with the complaint you've brought is an Article III standing issue. How is your claim redressable? You've sought declaratory and injunctive relief against – is it the governor, the attorney general, and the DNR head? Correct. Okay. What could they possibly do to redress your alleged injury, given Gunderson? Well, Your Honor, as we allege in the complaint in paragraph 18, we allege that DNR has control of the Lake Michigan coastal zone under Indiana law. Okay, I get that, but let me even be more specific. Can the DNR confer title to the property to your clients? Well, Your Honor, I think we would – Just focus on that question for a moment, and then you can continue your thought. Do you think the DNR has that authority? The DNR has authority not to enforce the decree from Gunderson that held that Indiana has exclusive title. Okay, but how does lack of enforcement redress your injury? Suppose, for example, your clients wanted to sell tomorrow. Part of the bundle of sticks that they want to sell is the property line down to the low watermark, correct? But they don't have it. Well, according to their deeds, Your Honor, they do have it. Well, no, no, but doesn't – I mean, a conflict between the deed and Gunderson, doesn't Gunderson win that? And that's precisely why we've sought injunctive and declaratory relief here, so that we – because DNR has the power to manage and control this public trust land. And I think what Judge Scudder is asking you is, does it have the power to reform the deed? Does it have the power to set aside an Indiana Supreme Court decision? Your Honor, DNR can not enforce its ownership interests below the ordinary high watermark. That's the part that confuses me. So I get – you would prefer a world of non-enforcement over enforcement. I get that. But a world of non-enforcement doesn't give you title to the property. It just means they're not enforcing the decision. Well, I mean, I would point to – But you've alleged a taking. Yeah, I would point to the Supreme Court decision in Nick where the court discussed the common law remedies for a taking and generally said that at common law, courts would set aside the taking because it violated the Constitution and order the property restored to its owner. And I think here, because there's no compensation remedy available, that is a – I think ordinary – if you're describing the law generally, I think that might be accurate. The problem – the challenge you have is that in your fact pattern, Gunderson exists. Yes, Your Honor, and I think our claim does not depend on a federal court declaring that Gunderson was an inaccurate statement of state law. As a matter of state law, well, surely the Northern District of Indiana and surely this court cannot overrule Gunderson. And that's – we don't claim otherwise. However, a judicial taking claim, as we've brought, simply assumes the state of the state law and takes – and it's the action of changing the law, which we've alleged, that we had clearly established property rights before 2018. And the Gunderson decree – Suppose you got the injunction you wanted, non-enforcement. You got that injunction this afternoon, and tomorrow the Pavloks wanted to sell the property. What would they be selling vis-à-vis the kind of delta that we're talking about? They would be selling the property that's on their deed that they owned until 2018. And so a deed search on that property would show, presumably, that it goes to the ordinary high watermark because of the Gunderson decision. Wouldn't the new – how would a title company reflect this injunction that you're talking about? Well, Your Honor, there's nothing in the record about exactly how title companies and others have responded to Gunderson when it comes to these – especially when it comes to these plats in Porter Beach that are below the ordinary high watermark. They still exist. And so the injunction would simply restore the state that existed before the Gunderson decision as to our clients. And that – It wouldn't confer title, though. That's what I'm hung up on. Well, Your Honor, our argument is that we've always had the title until 2018 and that the state, by changing the law, the state assumed that title. But that an injunction would simply restore the state of the law back to where our deeds, the boundaries of the platted deeds that we've alleged in the complaint, would control the ownership interest because the state would be enjoined and the state officials that we've sued would be enjoined from enforcing the taking. And we've only sought this because there's no other remedy. Well, because you lost. You have a strange argument, in my opinion, about that. You say, well, we can't go back to the state courts because Gunderson is there. And I thought to myself, well, I guess that means you don't file Brown v. Board of Education either because Plessy was there. You know, you can go back to the highest court if you think they made a serious mistake of taking law or property rights. But putting that to one side, your critical move is that you actually had this right, which somehow accrued at some point between Indiana's entry into the union as an independent state, as one of the co-equal states, and Gunderson. And even maybe your strongest case on which you're compelled to rely on the plurality opinion, the Stop Beach Renourishment case, doesn't seem to help you. The parts of that opinion that reflect an opinion of the court make it really quite clear that you don't have a judicial taking, assuming there is such a thing, which I'll assume for the moment you don't have one, unless the judicial opinion changes something that was clearly established. And it's hard for me to see this as established. So she says, the takings clause only protects property rights as they are established under state law, not as they might have been established or ought to have been established. So I think that's a problem. Well, Your Honor, we're on a motion to dismiss here, so our allegations of— But this is a question of law. We can address this. That's true. However, our allegations that we have, the platted deeds that go below the ordinary high-water mark, and then combine that with all the other allegations of what happened in the 20th century, but also combine that with the 19th century case law in Indiana, and then the case law in the other Midwestern states, where no other Midwestern state had ever adopted this rule. But what you're saying essentially is if you file a plaque that says you've got the land all the way out to the middle of Lake Michigan, then the state Supreme Court can't write an opinion saying, actually, no, you don't. You only have to the ordinary high-water mark. I don't think that's true, Your Honor. I think because the law was so clear in those Ohio River cases, and they were Ohio River cases, but they were based on the idea that because the Ohio River was navigable and non-tidal, it was fundamentally—the non-tidal part of it was fundamentally different from what the English common law rule had been. And so that's why the court said, no, you own to the low-water mark of the Ohio River. And there's—just because there's been no—and I would note that the Indiana Court of Appeals decision in Gunderson that was partially reversed actually did apply that rule and the same rule from the Michigan Supreme Court decision in Glass that said that property owners own to the low-water mark along Lake Michigan subject to a public trust. And that's the rule in Michigan, and that's the rule in— But states can choose to derogate from their equal footing status. That's true. Absolutely clear. So the fact that some states have chosen to do that and others haven't doesn't get me too far. Your Honor, I'm certainly not arguing that Michigan—the Glass decision is binding on Indiana. I'm simply arguing that there's a line of cases in the 19th century that applies this low-water mark framework, and then there's the Court of Appeals decision in Gunderson that follows the Michigan framework, and then— But that's the Court of Appeals. —first in 2018, we have this—in 2018, we have this for the first time, the court saying, no, actually the state owns title to the high-water mark, exclusive title to the ordinary high-water mark. And that was the first time in Indiana history that that had been decided, and we've alleged plausibly that our clients had those property rights before the court said that the state actually holds exclusive title. And the holding there is not required by the equal footing doctrine. The equal footing doctrine allows the states to do essentially what they want with their equal footing lands. And the Indiana Supreme Court decided in 1837 that as to equal footing lands along the Ohio River, that it would be to the low-water mark. And when you combine that with the history that we've alleged and the plotted deeds that we've alleged, it's at least plausible—I think it's more plausible than the argument that nobody knew what property rights were along Lake Michigan until 2018, which is essentially my friend on the other side's argument, and Gunderson said that they were—it was clarifying property rights along Lake Michigan. Well, if nobody knew what property rights were along Lake Michigan for 180 years, then it would be hard to imagine all the development that occurred in that time. And, for instance, in the federal government coming in and buying up the land that we've alleged for the National Lakeshore and coming to the Pavlocks and asking for an easement to walk across that shore, and it's all bolstered by the fact that we have these deeds that are actually plotted on the survey that is attached to the complaint. And so I would simply submit that, especially at this stage, that we've alleged enough that we do have an established property right, that if we prove that we have that right, we would establish a taking under the standard Stop the Beach, which I also— Well, which—that's your case, right, you know, the plurality opinion of Justice Scalia, because the court as a whole finds that there's no taking Stop the Beach. Yes, Your Honor, but I would go back— And more justices are reluctant to embrace the judicial takings idea. You've got Justice Kennedy and Justice Breyer saying, whoa, you know, not so fast. The implication is, is every quiet title action from now on involving the state a potential judicial taking? I mean, there are some serious issues here. Well, I would go back to actually Webb's Fabulous Pharmacies where the court said that a state by judicial decree cannot take property and transform it from private to public without compensation. I don't think the idea of a judicial taking started with Stop the Beach. That case has simply produced a fractured opinion that we rely on, obviously, Justice Scalia's plurality opinion as persuasive authority, but it's not— Right. Okay. But I would suggest that I think I'm out of time. All right. You are out of time. Thank you very much. We would ask the court to reverse. Certainly. Mr. Jones. Good morning, and may it please the court. There's a threshold question that this court has to answer before it can get to any of the merits issues that I think we've been discussing this morning, and that is whether the district court had jurisdiction to address this question in the first place, and it does not. The Ex parte Young Doctrine does not authorize district courts to quiet title against the states. That is one of the three exceptions to the exception that is the Ex parte Young Doctrine, and it is supported by both the rationale and sort of the legal fiction that Ex parte Young embraces. Ex parte Young relies on the proposition that when federal courts compel state officials to comply with federal law, it is not offending sovereign immunity because the state itself is not the real party in interest. But there are limitations to that doctrine when the state itself is the real party in interest. Ex parte Young doesn't authorize orders for the payment of money, doesn't authorize specific performance of contracts, and it does not authorize quiet title actions against the states. So what you're relying upon, of course, is Coeur d'Alene. Yes. And this case seems different to me than Coeur d'Alene. You have two sovereigns there, right, tangling over ownership of the specified parcel in the lake there. This doesn't seem – at some level of generality, this has a flavor of a quiet title action, but at a more specific level, it doesn't in light of Gunderson. It just brought us a straight-up takings claim that way. And I guess as part of figuring out whether property was taken, at some general level, you'd be quieting title that way. And we know, don't we, from other strands of the Court's 11th Amendment jurisprudence, take the case last year, Cedar Point, for example, that you can invoke Ex parte Young and seek declaratory or injunctive relief against a state official in the takings context. So why doesn't that line of cases over Coeur d'Alene apply here? Well, two responses, Your Honor. First, speaking to the identity of the plaintiff, and I understand that Coeur d'Alene involved a sovereign tribe bringing a suit against the state of Idaho. But, of course, Ex parte Young is not concerned with the identity of the plaintiff. It's concerned with the identity of the defendant and the nature of the relief sought. And here, the nature of the relief sought is extinguishing the state of Indiana's interest in the land below the ordinary high-water mark on Lake Michigan. Which gets to my second point, which is, this is not a straightforward takings claim. It's a quiet title action. When you look at the request for relief asserted in the amended complaint, it is where they ask the Northern District of Indiana to forbid the state of Indiana, as well as the four named defendants, from exercising ownership over the shore of Lake Michigan. That is a quiet title action. See, that's where I, okay, I'm really grateful you focused on that. That's where I see an Article III standing redressability issue. Because it doesn't matter whether the attorney general or the governor or the head of the DNR, it doesn't matter what they think about Gunderson. They may think good, bad, or indifferent. What difference does it make? It's a pronouncement of the state's highest court that way. So how do they have any authority whatsoever over title to the land? That's where I get hung up. And I think if that's right, that's a threshold Article III standing redressability problem. No subject matter jurisdiction. I agree with that, Your Honor. And, of course, the court would be entitled to address either the ex parte Young analysis or the redressability and standing analysis. Yeah, the only reason I'm, I mean, that's just the way I read it. But I think that the ex parte Young-Curtilane distinction, and how do you construe that? That's just much more, it gets complicated. More complicated, and at least vis-à-vis the standing issue in my mind. But you didn't argue, you didn't make an argument under Article III that way. You got redressability, there's redressability arguments with respect to they didn't name the right party. But that's a different flavor of redressability than I'm talking about. Well, I think our argument was, and the purpose of our redressability argument was, is the point that you made, Judge Scudder, earlier this morning, which is that none of these individual defendants own title to this land, and none of these individual defendants can convey title to it. That Gunderson holds that the Indiana General Assembly is the only entity that can authorize conveyance of that land, and until it does so, none of these defendants are capable of returning ownership, if that's what actually occurred. We dispute that, obviously. Are capable of returning ownership to the past. I see not enforcing it. Not enforcing something is usually what's sought in an injunction scenario with the takings claim. That way, that cedar point, for example. Okay, but non-enforcement doesn't remedy the taking. Here, that's the problem that I have. I don't see how, if the head of the DNR says, fine, I disagree with Gunderson too, I'm not going to enforce it. They're still alleging the property was taken from them. It doesn't give it back to not enforce it. You see what I mean? Right, and the state would agree with that. That none of these four defendants, that the injunction, to remedy the taking, the injunction would have to return the land. But none of these four defendants are capable of doing that. And I think that circles back to the Coeur d'Alene issue, which is that returning state lands or a federal court transferring title in state lands is barred by Ex Parte Young, because that is no different than an injunction that orders a payment of money. It infringes upon sovereign lands. And so that is why, in our view, Coeur d'Alene is a threshold bar to this suit. So do I understand you to be arguing then that as we went our way through Coeur d'Alene and Verizon and VOPA and all of these cases, the ones that, not just the ones that would require a payment of funds from the state treasury, but also the ones that affect what the court calls the domain of the state, the land of the state, are also not subject to— I'm trying to figure out how broadly you're arguing this. Are those things that are not subject to the Ex Parte Young fiction? I think, in our view, that at least Coeur d'Alene and that restriction reaches to a federal court transferring title of state lands away from the state. And you also think, I take it, that before anything else can happen with respect to these lands between the low and the high water mark, we have to know who they belong to. And your opponent argues very strongly that they actually, before the Gunderson case, belonged to the lakeshore owners because they said they owned it and they were paying taxes and they were restricting other people from going on it and they were doing all sorts of things that owners of land do without any objection. And then Gunderson comes along and all of a sudden everybody says, oh, actually this belonged to the state all along. You have to allow the public to swim and fish and wander around, whatever. But you don't think you can skip over the ownership question, which is why you get to the Coeur d'Alene. Exactly. And Judge Scudder, I think this gets back to your question about Cedar Point. I think the difference there was there was no dispute that the agricultural owners in Cedar Point owned their farmland and that what California is doing is effectively enforcing an easement on their land by requiring them to allow people onto their land. I think, given that there was no dispute about underlying ownership of the land, it's categorically different here than plaintiff's assertion, which is that they do or did own that land. And so the dispute is over who owns who owns title below the ordinary high watermark in their view. Well, can I just refine that? I think since they say they did own the land and it was established between the low watermark and the ordinary high watermark, if that's the case, then what Gunderson did is it changed established land ownership rights. And if you then take the next step and think there could be a judicial taking, you would then say whatever else Stop the Beach was talking about. It was saying whether it's a court decree or a legislature or an executive body, if somebody takes away property rights that you had, then you're entitled to relief. That takes us, of course, to Judge Scudder's question, because you can't get money. You can't get just compensation from the state in this context. Maybe there's some lawsuit for a NIC-type lawsuit in the Indiana courts to seek compensation for what the Supreme Court did. I don't know, but certainly not this litigation. Exactly. And I think we touched on this earlier, too. But I think what is fundamentally missing from that argument, and maybe, Judge Scudder, this is where you're having trouble with seeing this as a quiet title action as opposed to taking, is that we have allegations about plats and deeds and past practices, certainly. And Judge Wood, I think as you point out, the Indiana Supreme Court addresses that specifically and says, well, those plats originated from the federal government, which, of course, didn't have authority to convey land below the ordinary high-water mark. And so those are of little use. And generally, these plats and deeds assign land going to the shore of Lake Michigan without defining where that shore is. But what Stop the Beach requires, assuming that a judicial taking is a cause of action and exists, we believe it does, and we find Justice Kennedy's concurrence persuasive. But even if the court disagrees, they don't get over the threshold to establish a taking because there's no evidence here of any clearly established right to that land. There's no legislative conveyance of the land to the private property owners on Lake Michigan. There's no act by the Indiana Supreme Court that clearly said that property owners on Lake Michigan. The Indiana Supreme Court in Gunderson walks through the nature of the Ohio River cases and explains that those are unique to Ohio River. And I think one of the cases cited in Gunderson is the Bainbridge case from the 19th century, where even the Indiana Supreme Court seemed skeptical of the proposition that it had gotten the question right, that the Ohio River owners actually owned the Ohio River mark. But because it was a settled matter of property law at that point, they were going to stick with that. See, that's interesting the way you say it. I was thinking about it a little bit differently, but it may not lead to a different end point. I think that the Pavloks can probably say, in the best of faith and with complete accuracy, Gunderson just tipped the apple cart over totally in terms of our expectation and reliance interests. And we've been paying property taxes, and we, our neighbors, everybody, we believe that we own this. It's in our deed. That's the way we read our deed, that way. I think, okay, maybe that's descriptively accurate, but it doesn't, how does it lead us to a different end point because of what the Indiana Supreme Court in Gunderson pronounced that way? You know, the court there said the properties never belong to a private landowner. It's forever been public land like this, and, you know, we hereby so declare that way. And so there's an expectation interest that's dashed that way, and a reliance interest that's dashed. It's just a very practical matter. But I don't see how we can deal, what can we do about that or the district court? I don't think the court can do anything with that. And I think that those sorts of factual allegations don't, are also insufficient to meet the proposition in Stop the Beach that they needed to have clearly established title to this land, to show a judicial taking if it's a real thing. And they don't have, expectations and behavior are one thing, but those aren't clearly established title. There's no Indiana Supreme Court decree through the state's history that says the Ohio River cases do apply to Lake Michigan, and then Gunderson reverses that. There's no conveyance from the Indiana General Assembly that conveys that land. And so without that sort of readily, clearly established state law. And this is where it gets circular because you come right back to it. And even if you're wrong about that, what could these defendants do to remedy that? I don't know. I don't know what they could possibly do because they can't confer title. Absolutely, Your Honor. And that's how the Coeur d'Alene, the threshold ex parte young question and redressability and standing are all tied together. And it comes back to the Indiana Supreme Court's resolution of a state law question. And that is, I think, the thrust of Justice Kennedy's concurrence, which is these are the vexing problems with trying to assert judicial takings and trying to remedy them. Right. Well, and Justice Breyer says similar things. I mean, we're getting a lot of arguments in this case from first principles or by analogy of this. And I didn't see in the country, actually, anything that looks quite like this that's ever happened before. Can you direct me if I missed something? Well, I think we cite, too, the Locano case out of the Ninth Circuit, which was similar. It's an action by individuals trying to quiet title to riverbeds in Alaska. And the Ninth Circuit held that the Coeur d'Alene tribe's bar on quiet title actions was a prohibitive. A prohibitive action. Right. No one has succeeded. I guess maybe I'll put it that way. No one has actually barred enforcement of a negative rule about where the title falls. I'm struggling trying to figure out the way I'm going to phrase this. But no one has actually stopped a judicial takings, quote, unquote, on this ground. So far as the state's aware, we have not found a case like that. I didn't see anything. So I think with that in mind, the padlocks are inviting a circuit split on the issue. And certainly without compelling case law in their corner, I don't think the court should accept that invitation. All right. Well, if there are no further questions, the state would ask that the district court's judgment be affirmed. All right. Thank you. Mr. Keyser, your time ran out, but I'll give you a minute if you'd like, a minute to rebut. I want to address the addressability and sort of the title issue that Judge Scudder, you mentioned. I think with respect to addressability, we have the DNR is the one who's in control of this property now, according to Gunderson. And so an injunction and declaratory relief that says you can't enforce that would, in effect, transfer, essentially allow the padlocks to continue to exercise ownership over the property. And that is essentially our claim for an injunction and declaratory relief. And I would also just, as Justice Scudder noted in his dissent in Coeur d'Alene, the government's assumption of title to property that's incorrect is no different from any other assumption of power that the government might not ultimately have. And so the remedy should be to reverse that. And that's why we've come here. All right. Thank you very much. Thanks to both counsel. We will take this case under review.